[Civ. No. 26945.   Second Dist., Div. Two.   Sept. 20, 1963.]

HARTFORD ACCIDENT & INDEMNITY COMPANY, Plaintiff and Appellant, v. BANK OF AMERICA, Defendant and Respondent.

546

Belcher, Henzie & Fargo, Belcher, Henzie & Biegenzahn and William I. Chertok for Plaintiff and Appellant.

Samuel B. Stewart, Robert H. Fabian and George L. Beckwith for Defendant and Respondent.

ASHBURN, J.—Action for declaratory relief in which plaintiff appeals from an adverse judgment.

Plaintiff's counsel made an opening statement at the trial pursuant to a stipulation "that said opening statement would be considered by the Court in the nature of an offer of proof upon which the Court could determine on the basis of the offer of proof whether he would direct a verdict against the plaintiff, declaring the rights and duties of the parties as a matter of law." Defendant Bank of America National Trust and Savings Association made a motion for judgment on the opening statement and same was granted. Thereupon the judgment was entered which forms the basis of this appeal.

The rules governing an appeal from such a judgment are set forth in *Bias* v. *Reed,* 169 Cal. 33, wherein it is said at pages 37-38 [145 P. 516] : " 'It is no doubt true, as is argued by the appellants, that the practice of directing a verdict, in advance of the introduction of evidence, upon the opening statement of one or the other party is a dangerous one and that an order granting such motion can be upheld only where it is clear that counsel has undertaken to state all of the facts which he expects to prove, and it is plainly evident that the facts thus to be proved will not constitute a cause of action or a defense, as the case may be. . . . In reviewing an order directing a verdict on an opening statement the appellate court must apply rules analogous to those which govern it in reviewing an order granting a nonsuit after the introduction of evidence. Every fact which counsel has stated as among the matters to be proved, *together with all favorable inferences reasonably to be drawn therefrom,* must be accepted by the court as facts which would have been proved if the case had been allowed to be tried.' " (Italics added.) To the same effect are: *Sayadoff* v. *Warda,* 125 Cal.App.2d 626, 627 [271 P.2d 140] ; *Paul* v. *Layne & Bowler Corp.,* 9

Cal.2d 561, 564 [71 P.2d 817] ; *Moffitt* v. *Ford Motor Co.,* 117 Cal.App. 247, 251 [3 P.2d 605] ; *Cortopassi* v. *California-Western etc. Co.,* 39 Cal.App.2d 280, 283 [102 P.2d 1093] ; *Kaukonen* v. *Aro,* 142 Cal.App.2d 502, 505-506 [298 P.2d 611].

The opening statement set forth the following facts. On September 18, 1959, plaintiff Hartford Accident & Indemnity Company issued to All American Nut Company, Inc., in consideration of a premium paid to it a fidelity bond with a liability limit of $2,500. The clerk's transcript shows that the "Insuring Agreement" reads as follows: "The Underwriter, in consideration of the payment of the premium, and subject to the Declarations made a part hereof, the General Agreements, Conditions and Limitations, and other terms of this Bond, agrees to indemnify the Insured against any loss of money or other property which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others, the amount of indemnity on each of such Employees being the amount stated in Item 3 of the Declarations." Reverting to the opening statement, it appears that Bonnie Porter was a general office clerk of All American and any loss occasioned by her fraudulent or dishonest act was covered by the fidelity bond. "That said Bonnie Porter did steal a certain check from All American and did turn same, together with samples of her employer's genuine signature, over to one Dan Aitken, who subsequently completed the check, making it payable to J. B. Cox Company, and forged the name of the official of All American as drawer; That on or about August 15, 1960, said check was deposited in an account opened at the Tweedy-Alexander Branch of the Bank of America National Trust and Savings Association [in the City of South Gate] in the name of J. B. Cox Company; the check was drawn upon All American's account at the First and Chicago Branch of the Bank of America; subsequently the funds, except for $785.35, were withdrawn from the account of J. B. Cox Company; that the amount of the forged check was $14,785.35, and that such amount was charged against the commercial account of All American at the First and Chicago Branch of the Bank of America; That such loss to All American was sustained through a fraudulent and dishonest act of one of its employees; that is, Bonnie Porter; That the check did not constitute a valid order of All American giving Bank of America a right as against All

American to charge the amount thereof to its account; That the Bank of America retains and claims as salvage the sum of $785.35, not withdrawn from the J. B. Cox Company account; That upon All American's demand made September 16, 1960, for $14,785.35, the Bank of America has credited to the account of All American the sum of $12,285.35, and that such total credit is $2,500 less than the amount charged against the account of All American when the forged check was presented; That the Bank of America has refused and does refuse to credit an additional $2,500 to All American's account; That on or about September 30, 1960, All American presented Hartford its claim in writing for $2,500, the penal limit of the bond, and that Hartford has refused to pay same and brought this action seeking to determine its rights, if any, as against the bank and All American; ... The evidence will further show that Hartford made a demand upon the All American Nut Company, pursuant to Civil Code section 2845, to proceed against the Bank of America for the $2,500, but that the all American Nut Company has refused to do so and informed Hartford prior to the commencement of this action that the All American Nut Company would proceed against Hartford for the $2,500. The evidence, we submit, will further show that the Bank of America was negligent in accepting for deposit and subsequently clearing the forged check for the following reasons: First, in failing to obtain any identification from Billy Dan Aitken when he deposited the forged check representing himself to be J. B. Cox, and this despite the fact that the custom and practice of the banking industry in August of 1960 in the County of Los Angeles and City of South Gate was to demand and receive identification from a depositor opening a new account and not to open an account without identification, and this further despite the fact that the Bank of America in August of 1960 instructed its employees to obtain identification from a depositor opening a new account and not to open such an account without identification; Second, in failing to telephone the maker of the check and verify the check when no identification was obtained from Billy Dan Aitken, and this despite the fact that in August of 1960 the custom and practice in the banking industry in the County of Los Angeles and City of South Gate was to make such a telephone call, and further despite the fact that the Bank of America in August of 1960 instructed its employees to make such a call

where no identification was obtained from a depositor opening a new account."

The court's ruling was as follows: "The Court finds that it is the right of the All American Nut Company to elect to pursue the plaintiff under the obligation of the bond that has been referred to in the opening statement, and the Court finds that it is the duty of the plaintiff, the Hartford Accident and Indemnity Company, to pay to the All American Nut Company the face amount of the bond in the sum of $2,500 with interest and costs incurred by the defendant All American Nut Company from September 30, 1960, to date, and to pay to the Bank of America costs incurred by said defendant. ... On the question of negligence, that if even all the affirmative matters as set forth in the plaintiff's opening statement with respect to items of claimed negligence on the part of the bank were established, the Court finds that in this action such items, which may be for the protection of the bank or for its customers, do not constitute such negligence that they would affect the equities as between the Hartford Accident and Indemnity Company and the bank."

Essentially this case presents a question of subrogation and it was so treated below. Although the insurer who issues a fidelity bond is not a surety for the employer and the principal, if any, is the unnamed and prospective criminal employee (cf. 44 C.J.S. § 13, p. 477; § 16, p. 479), the courts by analogy have held the principles of subrogation to be applicable to a fidelity bond situation and the insurer may have subrogation against a third party provided its equities are superior to those of the third party. This applies to banks as well as other third parties.

The applicable rules are summarized in 46 Corpus Juris Secundum section 1209, page 162: "*Subrogation against bank generally*. On payment by insurer of insured's loss resulting from an employee's forgery of checks insurer immediately becomes vested with all the rights of the employer against the drawee bank, subject to the priority of equities as between insurer and the bank. It has been held that, where an employer has recovered on a fidelity bond by reason of his employee appropriating his money deposited in a bank by raising or forging checks, insurer is not entitled to subrogation to any right of action of the employer against the bank, particularly where the bank knew no facts suggesting the employee's fraud, and the superior equities, as between the

bank and insurer, were with the bank, and where no loss was sustained directly by reason of the issuance or alteration of the checks; and a like rule has been applied as against a bank in which the defaulting employee deposited misappropriated funds.

*"The case is a proper one for subrogation, however, where the bank was negligent because of knowing at the outset of the employee's defalcations, or where the bank was put on inquiry to ascertain the facts ...."* (Italics added.)

In this state it is established that the insurer's right to subrogation against a bank which has paid a forged check or the like and charged same to the account of its customer depends upon whether the insurer's equities in the particular situation are superior to those of the bank. The leading case is *Meyers* v. *Bank of America,* 11 Cal.2d 92 [77 P.2d 1084]. In that instance plaintiff's office manager had received checks payable to plaintiff, had forged the name of the payee and had negotiated the checks with defendant Wascher, who paid full value for the same; the manager converted the proceeds of the checks to his own use; defendant Wascher deposited them in his bank account with defendant bank which received full payment from the respective drawees. Plaintiff was protected by a fidelity bond issued by United States Guarantee Company which reimbursed plaintiff for his loss. He assigned to the bonding company any cause of action he had against the bank and then brought the action on behalf of the bonding company. Judgment for plaintiff was reversed by the Supreme Court. It held first that the assignment added nothing to the right of subrogation which is essentially a creature of equity and that the claimed right must stand or fall upon the equities existing in the respective litigants. It then examined the authorities bearing upon the question of the relative equities of the insurer and the bank and concluded that the one who asserts subrogation against a third party, such as a bank, must establish a superior equity. At page 102 it quoted an Indiana case as follows: " 'It has with almost unanimity been held not to apply *in favor of a surety on a fidelity bond,* except only against persons who participated in the wrongful act of the wrongdoer.' " It concluded (p. 102): "Thus, it may be observed that there are two lines of cases governing the questions here presented, each wholly at variance with the other. We think the great weight of authority rests with the group

last referred to, and that the principles there announced, in good conscience ought to be applied to the circumstances of this case. As stated hereinbefore, the right to maintain an action of this kind and to a recovery thereunder involves a consideration of, and must necessarily depend upon the respective equities of the parties. Here, the indemnitor has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the indemnitor nor the bank was the wrongdoer, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but *in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt,* and from which it received no benefits. The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss. . . . [Italics added.]

"Our conclusion, as hereinbefore has appeared, is that since the bonding company had no superior equities, it was not entitled to be subrogated to any claim plaintiff might have had against the bank." (P. 103.)

In the various cases reviewed in the opinion the bank is said to have had the lessser equity when with respect to the particular transaction it was " 'a wrongdoer' " (p. 98), or " 'participated, with notice, in the illegal act of the principal which served to bring about the loss' " (p. 99), or guilty " 'of negligence or wrongdoing' " (p. 100), or " 'participated in the wrongful act of the wrongdoer' " (p. 102). The court did not commit itself to any one of these touchstones to inferior equity; it merely held that a bank which in the ordinary course of banking business had paid money on checks the genuineness of which it had no reason to doubt, was not a wrongdoer and its equity was not inferior to that of the paid insurer. It will be noted that the text of 46 Corpus Juris Secundum section 1209, page 162, quoted *supra,*

lists negligence of the bank or failure to inquire as to the facts when on notice so to do, as basis for allowing subrogation against it—this because its equities are thereby rendered inferior to those of the insurer.

*Barclay Kitchen, Inc.* v. *California Bank,* 208 Cal.App.2d 347 [25 Cal.Rptr. 383], held that the bonding company had a superior equity and an enforceable right of subrogation against a bank which had been negligent and thus had furthered the fraud committed by an employee of the insurer. Mrs. Gianopulus was a "one-man office" for Barclay. In order to defraud her employer she deposited in California Bank some cash and a Diners' Club check for $4,260.48, payable to Barclay; she made out four deposit slips for $900 each and one for $1,455.98, thus indicating that four different deposits of $900 had been made. She was authorized to make deposits and to withdraw up to $1,000 cash each week for use over the weekend; usually she drew $900 a week and redeposited the same amount on the first banking day thereafter. She misappropriated many of these $900 withdrawals and made the four deposit slips as part of the Diners' Club deposit in order to conceal from her employer (at least in part) her embezzlements. The bank accepted these deposit tickets upon Mrs. Gianopulus' representation that it was necessary "for bookkeeping purposes." "The deposit slips themselves serve only as a preliminary step in the negligent act of Bank. Viewed alone the slips did not cause the loss because Barclay did not require duplicates and the originals were not seen by Barclay's accountants before the losses were discovered. However, acceptance of the deposit slips in the form in which Mrs. Gianopulus made them out caused the deposit amounts to be posted to Barclay's statements in a manner which misled Barclay to believe that certain statement credits were cash redeposits when in fact they were portions of Diners' Club checks. Therefore, viewed as a whole the deposit slips and the resulting postings to Barclay's statements combined as a cause in misleading Barclay, permitting Mrs. Gianopulus to carry out her scheme of defalcation." (Pp. 350-351.)

After discovery of the facts Barclay sued California Bank and National Surety Corporation, which had written a fidelity bond covering defalcations of employees of Barclay. The court rendered judgment "on the theory of negligence" against the bank for $11,467.67, the full amount of Barclay's

loss, and against the National Surety Corporation for $4,013.86, the amount of its liability on the bond, which amount was to be reduced by any recovery from the bank exceeding $7,453.81, the difference between the total loss and the surety company's liability on the basis of subrogation. The bank alone appealed.

The court said, in part: ''The officers of Bank who approved the deposits testified that the procedure employed here by Bank employees was irregular and contrary to policies and procedures of Bank. ... [I]t is elementary that an agent's authority cannot be delineated by his own representations. [Citations.] This rule is not changed when the relationship of the parties is bank and depositor [citation]; and where the depositor is a corporation the bank has a legal duty to ascertain that the acts of the agents of the corporation are authorized. [Citation.] Having accepted the deposits in question, admittedly irregular, without some effort to ascertain the agent's authority beyond her own representations, Bank cannot now absolve itself from liability by asserting an ostensible authority in the agent where in fact no authority was given. ... *Custom and usage in the business of banking may be part of a contract of deposit if such custom or usage is reasonable and does not contravene any principle of law.... Bank impliedly promised to keep accounts according to usual customs and procedures and render statements of account in accordance therewith.* The testimony of Mr. Marcoux and Mr. Jones noted above shows that those procedures were not followed. Upon learning of the first transaction Mr. Marcoux instructed the teller involved not to accept future deposits in this form, yet on two more occasions such deposits were accepted. Since the effect of this irregular procedure was to render inaccurate statements in Barclay's account of deposits, *it must be held that defendant acted negligently* in performing its duty to render faithful and accurate accounts under the contract of deposit with plaintiff.'' (Pp. 352-354.) (Italics added.)

At page 354: '' (1) Was Bank's conduct in fact a cause of Barclay's loss? The rule is that defendant is not liable for plaintiff's injury unless in fact he causes the injury. 'The whole doctrine of responsibility for negligence is based upon the postulate that without such negligence the injury would not have occurred,' [Citations.] The test for determining cause in fact has been clearly articulated in Prosser, Torts (2d ed.) page 218: 'If the defendant's act or omission was a

substantial factor in bringing about the result, it will be regarded as a cause in fact. Ordinarily it will be such a substantial factor if the result would not have occurred without it.

" 'The plaintiff is not required to establish the fact of causation with absolute certainty. It is sufficient that he introduces evidence from which reasonable men may conclude that it is more probable that the defendant's conduct was a cause than that it was not.'

"California cases are in accord with this statement. (*Woo* v. *Martz*, 110 Cal.Ap.2d 559, 563 [243 P.2d 131]; *Gibson* v. *Garcia*, 96 Cal.App.2d 681, 685 [216 P.2d 19].)"

Also, at page 355: "Since there is substantial evidence in the record to show the thefts would have been discovered but for the bank's negligence, that negligence was a substantial factor in causing the loss and therefore must be regarded as a cause in fact of the loss."

And at page 356: "As a final point Bank argues that as between Bank and Surety, Surety should bear the loss; that the right of subrogation does not exist in favor of a surety on a fidelity bond except against persons who participated in the wrongful act of the principal.

"But in the present case, unlike the cases cited by Bank, Bank is not an innocent third party. In *Meyers* v. *Bank of America*, 11 Cal.2d 92 [77 P.2d 1084], the court held the surety liable as against the bank where the bank, not being a wrongdoer, paid money in the ordinary course of its business upon checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. Here, Bank was not innocent. Its negligence made possible the consummation of Mrs. Gianopulus' fraudulent scheme. Its *employees admittedly departed from the 'ordinary course' of their banking business*. They should have been alert to Mrs. Gianopulus' misrepresentation of authority. [Italics added.] ..."under the circumstances here the court properly subrogated Surety to the rights of Barclay. However, it should be noted that Surety will be liable without set-off against Bank for such portion of the losses determined on retrial not to be attributable to Bank's negligence to the extent such losses are covered by the fidelity bond." The Supreme Court denied a hearing.

It will be noted that the basic fault of the bank was departure from the ordinary course of their banking business, that observance of same was a duty owed to the customer as well

as the bank itself, and when that departure became a substantial factor in causing the loss, the bank's equity became inferior to that of the surety corporation.

In *Liberty Mut. Ins. Co.* v. *Kleinman,* 149 Cal.App.2d 404 [308 P.2d 347], it was held that individuals who cashed checks upon forged endorsements made by an employee of the insured were not at fault and hence the insurance company which wrote the fidelity bond could not recover from said persons. The court said, at page 407: "If defendants had knowledge of any facts which made it their duty, in the exercise of ordinary care, to make inquiry of Blue-Print, they were chargeable with knowledge of Eddy's want of authority to negotiate the checks. We do not doubt that there is reason to suspect the authority of an agent who endorses his principal's name upon checks, by himself as agent, and openly cashes them for his own use." The test there applied was negligence: "In the balancing of the equities as between plaintiff and defendants the question of defendants' negligence was the critical one. . . . Our conclusion is that the question of defendants' negligence was one of fact as to which the determination of the trial court is based upon reasonable inferences and that the finding is controlling upon appeal. The court concluded that the equities favoring defendants were superior to those favoring plaintiff and, upon the facts found, we agree." (Pp. 408-409.)

*J. G. Boswell Co.* v. *W. D. Felder & Co.,* 103 Cal.App.2d 767, 773-774 [230 P.2d 386], dealt with the wrongful sale of plaintiff's cotton by its employee. The court held that defendant was an innocent purchaser and hence there was no right of subrogation against him. Among other authorities, the court relied upon section 3543, Civil Code, which says: "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer."

*American etc. Ins. Co.* v. *Capital Nat. Bank,* 75 Cal.App.2d 787 [171 P.2d 49], held that defendant bank was an innocent third party and hence no subrogation would lie in favor of plaintiff's fidelity insurer.

*Fidelity & Deposit Co. of Maryland* v. *De Strajman,* 215 Cal.App.2d 10 [29 Cal.Rptr. 855] (no petition for hearing in Supreme Court filed). The Fidelity and Deposit Company sued to recover moneys paid to its insured, Western Title Insurance and Guaranty Company, for loss sustained on instruments forged by one Irvine, who was manager of an

apartment house owned by the De Strajmans. Mrs. Irvine failed to pay mortgage installments and income taxes, hence liens were filed against the property. She, in order to pay off the first lien, borrowed $4,500 from the Holcenbergs on a note and trust deed, the signatures of the De Strajmans thereon being forged by Mrs. Irvine. The Holcenbergs filed a claim against Western Title which paid them $4,500. Plaintiff Fidelity indemnified Western Title; then, as assignee of Holcenberg and Western Title, brought action against the De Strajmans to reinstate the liens and have same foreclosed for its benefit on the theory that the De Strajmans "were unjustly enriched at its expense." Treating the matter as one of subrogation the court relied upon the *Meyers* decision, *supra*, and said at page 12: "Subrogation does not lie as against innocent parties such as respondents. ... There is no question that in the instant case the respondents were innocent parties with respect to the fraud of their agent, Mrs. Irvine. The fact that the complaint also states that appellant is the assignee of Holcenberg and Western Title does not change the fact that if the surety is not entitled to subrogation, an assignment by the creditor will be ineffectual to give the surety a right of subrogation he would not otherwise have.

"Following the rule of the *Meyers* case, here appellant has discharged its primary contract liability. It has paid what it contracted to pay and retained to its own use the premiums paid. It now seeks to recover from an innocent party. The cause of the loss was the forgeries and this was the very loss appellant agreed to pay and accepted premiums for. We cannot say that as between the paid surety and the respondents that the respondents should bear the loss because if the respondents must pay back to appellant, then respondents must bear the loss caused by the forgeries."

Concerning *Hensley-Johnson Motors* v. *Citizens Nat. Bank*, 122 Cal.App.2d 22 [264 P.2d 973], a comment found in 43 California Law Review 85 says, at page 93: "In the latest California case involving the insurer and the drawee bank which honored the forged check of the insured's defaulting employee, a new theory was relied upon to deny subrogation to the insurer. The District Court of Appeal held that the insurer might not be subrogated for the insured had made an 'election of remedies.' The insured, therefore, could pursue his remedy against either the insurer or the bank, but an

action against one discharged the other. This theory would seem to have no merit and should be discarded. It is based on a Texas decision which has since been reversed. Furthermore, to permit an 'election' by the insured to decide the ultimate incidence of the loss is undesirable. It is preferable to determine the ultimate incidence of loss by fixing the relationship between the insurer and the bank without regard to the actions of the insured.'' This seems to us to be correct.

Of course, there is no facile formula for determining superiority of equities, for there is no formula by which to determine the existence or nonexistence of an equity except to the extent that certain familiar fact combinations have been repeatedly adjudged to create an equity in the surety or the third party. The cases in other jurisdictions refer to various factors which spell fault in the bank as third party, but whatever the criteria mentioned each case comes down to the question of fault of some kind, not necessarily negligence or proximate negligence.

*Oxford Production Credit Assn.* v. *Bank of Oxford,* 196 Miss. 50 [6 So.2d 384, 388], adopts negligence as the test. This is also true of *United States Guarantee Co.* v. *Hamilton Nat. Bank,* 189 Tenn. 143 [223 S.W.2d 519, 521], and our California case of *Liberty Mut. Ins. Co.* v. *Kleinman, supra,* 149 Cal.App.2d 404, 408.

The insurers are free from fault in practically every instance where subrogation is claimed and the cases turn in the main upon the question of whether the defendant bank is at fault in some manner or degree as, for instance, through failure to make normal inquiry.

*Independence Indemnity Co.* v. *Republic Nat. Bank & Trust Co.* (Tex. Civ.App.) 114 S.W.2d 1223, 1227, says: ''... the defendant bank, being put upon inquiry to ascertain the actual authority of the agent Metcalfe to deposit the checks in his personal account, does not occupy such a position of innocency as will except it from the principles of the broad equitable doctrine above referred to.''

*National Surety Corp.* v. *First Nat. Bank,* 278 Ky. 273 [128 S.W.2d 766]. After distinguishing cases where subrogation had been denied because defendant was not at fault, the court at page 770 upheld the surety corporation's right of subrogation because the bank was on notice which it disregarded.

*American Surety Co.* v. *Bank of California* (9th Cir.) 133 F.2d 160. In this case one Crowe was a bookkeeper for Inte-

rior Warehouse Company, charged with the duty of preparation of payroll checks. Over some years he made out checks to former employees, to present employees who had been paid in some other manner, and to fictitious persons; the checks were duly signed by corporate officials but Crowe forged the endorsements and pocketed the money. American Surety Company and Lloyds of London had insured Interior against loss through dishonesty of employees. They paid the loss in full and then sued Bank of California which had cashed the checks and charged same to Interior's account. The court said, at pages 162-163: "A surety may pursue the independent right of action of the original creditor against a third person, but it must appear that said third person participated in the wrongful act involved or that he was negligent, for the right to recover from a third person is merely conditional in contrast to the right to recover from the principal which is absolute. The equities of the one asking for subrogation must be superior to those of his adversary. If the equities are equal or if the defendant has the greater equity, subrogation will not be applied to shift the loss. . . .

"In the instant case the surety contracts are confined to Insurers and Interior. Any right of recovery against third parties for money paid Interior by Insurers under the contracts must rest solely upon a weighing of the equities as between the third parties and Insurers. Such equities generally depend upon participation in wrongdoing, negligence, or knowledge, *although we do not mean to say that these expressions cover the gamut of equities which may or should be considered.* . . .

"In all of the situations outlined defendant had actual knowledge of facts sufficient to put them on notice of the wrongdoing and in a way, therefore, were implicated in the wrong done." (Italics added.) The holding was that there was no right of subrogation because the bank was not on notice of the fraud and was not at fault in any way.

*Security Fence Co.* v. *Manchester Federal Sav. & Loan Assn.*, 101 N.H. 190 [136 A.2d 910]. In this case the court said, at page 912 [136 A.2d] : "The defendant bank relying upon the absence of a finding of negligence, maintains that its equities are superior." At page 913 [136 A.2d] : "The payment of the money order by the bank upon the unauthorized endorsement of the agent clearly furnished the opportunity for misappropriation of the funds. Thus the bank may

not reasonably be relieved of responsibility upon the theory that its conduct was not causal of the loss. ...

"We take it to be similarly the established law in the field of bills and notes that 'any person taking checks made payable to a corporation ... does so at his peril and must abide by the consequences if the agent who endorses the same is without authority, unless the corporation is negligent ... or is otherwise precluded by its conduct from setting up such lack of authority. ...' *Standard Steam Specialty Co.* v. *Corn Exchange Bank,* 220 N.Y. 478, 481 [116 N.E. 386, 387, L.R.A. 1918B 575]. ...

"The agreed statement of facts contains no evidence that the defendant exercised any care to determine the extent of the authority of the payee's agent. His lack of authority is established by the finding of liability under RSA 337:23. Endorsement of the instrument by the agent as manager of the corporate payee was notice to the defendant bank of the agent's claim of authority to enforce the instrument in his principal's name. The endorsement was accepted by the bank without investigation of the claimed authority. [Citations.] There was no evidence of prior dealings such as would warrant reliance upon any apparent authority. [Citation.] It follows that the defendant bank may not successfully assert that its equities are equal or superior to those of the surety. Upon the facts stated a finding that its negligence contributed to the loss is compelled."

Restatement of the Law of Security, section 141, comment (c), on page 390, says: "The rule stated in Clause (c) is limited to the situation where a person by negligence or willful conduct shares responsibility for the principal's default and thus contributed to the cause of the surety's liability. *The rule so stated does not carry the negative inference that there are not other cases where the surety is subrogated either to the creditor's entire right against others or to the extent that the surety can compel contribution."* (Italics added.)

Illustration 17: "P is an employee of C, for whose fidelity S is surety. C has an account with the T bank to which he gives the names of the only employees who are authorized to make deposits and withdrawals. P is not one of such employees. P appears at the bank with a number of negotiable instruments which as known to the bank, belong to C. P states he has been authorized to collect them in cash. Although this is an unusual procedure the bank without any inquiry under

circumstances clearly negligent cashes the items for P, who dissipates the proceeds. S pays C the amount of P's defalcation. S is subrogated to C's rights against the bank.''

Bearing in mind the rule that appellant at bar was and is entitled to the benefit of every fact asserted in counsel's opening statement ''together with all favorable inferences reasonably to be drawn therefrom'' (*Bias* v. *Reed, supra,* 169 Cal. 33, 38), we are persuaded that plaintiff-appellant is entitled to subrogation against respondent. Primarily the opening statement spells negligence on the part of the bank. Custom is competent evidence of the standard of due care in an area wherein it prevails. (*Miller* v. *Midway Fishing Tool Co.,* 106 Cal.App.2d 612, 614 [235 P.2d 630]; *Fowler* v. *Key System Transit Lines,* 37 Cal.2d 65, 68 [230 P.2d 339]; *Tucker* v. *Lombardo,* 47 Cal.2d 457, 464 [303 P.2d 1041]; *Bouse* v. *Madonna Construction Co.,* 201 Cal.App.2d 26, 30 [19 Cal.Rptr. 823]; *Varas* v. *Barco Mfg. Co.,* 205 Cal.App.2d 246, 258 [22 Cal.Rptr. 737].) And violation of a rule of care established by a party to the litigation is likewise evidence of negligence. (*Davis* v. *Johnson,* 128 Cal. App.2d 466, 472 [275 P.2d 563]; *Simon* v. *City & County of San Francisco,* 79 Cal.App.2d 590, 597 [180 P.2d 393]; *Powell* v. *Pacific Electric Railway Co.,* 35 Cal.2d 40, 46-47 [216 P.2d 448].)

In August 1960, the pertinent time, it was the custom and practice of the banking industry in the County of Los Angeles and the City of South Gate (the location of the branch bank accepting the deposit) to demand and receive identification from a depositor opening a new account (in this case Billy Dan Aitken, who represented himself as J. B. Cox), and not to open an account without identification. The same custom included telephoning the maker of the check to verify it when no identification was obtained from the person opening the account. The defendant bank had adopted this custom and practice as its own by instructing its employees to adhere to it. In both respects the custom was ignored and that fact is evidence of negligence of the bank, sufficient basis for an inference of negligence in performance of a duty resting upon the bank as a protection to the customer as well as itself. It is further inferable that the taking of these precautions would have resulted in no account's being opened by Aitken and no loss being suffered by All American or its indemnitor, Hartford.

But it is really inconsequential whether the bank's disregard for existing custom amounted to negligence, for the insurer being faultless the bank had constructive notice of facts which should have prompted action on its part, inquiries which if made doubtless would have frustrated Aitken's plan and thus prevented any loss to itself or plaintiff Hartford. Having such notice and failing to act upon it facilitated Aitken's fraud and placed the bank in a position of fault which, compared with the innocent status of Hartford, dictates the conclusion that Hartford's equity is superior to that of the bank and as between them the latter should bear the loss.

The fact that plaintiff Hartford was a compensated "surety" cannot swing the balance of the equities in favor of the defendant bank; although that is a fact to be considered, it is no more than that; and here it loses significance because the bank itself was compensated for its services through the use of its depositors' money. Moreover, section 2837, Civil Code, provides: "...Except as provided in section 2794 [where the promise is to be deemed an original obligation of the promisor], the position of a surety to whom consideration moves is the same as that of one who is gratuitous."

50 American Jurisprudence section 51, page 717: "The right of a surety discharging the obligation of his principal to be subrogated depends upon his legal status as surety, and not upon any reasons which may have induced him to enter into the relation. No distinction in respect to subrogation can ordinarily be made between compensated and gratuitous sureties. So, the fact that the suretyship is one for compensation does not deprive the surety of the right to subrogation." (See also, 83 C.J.S. § 47b, p. 669.)

The facts are undisputed and hence this court is not bound by any of the findings of fact or by any of the conclusions of law made by the lower court. We conclude that upon the record before us plaintiff was entitled to a favorable declaratory judgment.

The judgment is reversed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied October 14, 1963, and respondent's petition for a hearing by the Supreme Court was denied November 13, 1963.