[No. G041188. Fourth Dist., Div. Three. Sept. 9, 2010.]

CHICAGO TITLE INSURANCE COMPANY, Plaintiff and Respondent, v. AMZ INSURANCE SERVICES, INC., Defendant, Cross-defendant and Respondent;
PACIFIC SPECIALTY INSURANCE COMPANY et al., Defendants, Cross-complainants and Appellants.

COUNSEL

Wesierski & Zurek, Thomas W. Ely, Laura J. Barns and John E. Stobart for Defendants, Cross-complainants and Appellants.

Gilbert, Kelly, Crowley & Jennett, Timothy Kenna, Craig H. Bell and Allan E. Perry for Plaintiff and Respondent.

No appearance for Defendant, Cross-defendant and Respondent.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

A binder is a contract of insurance that provides coverage pending the issuance of the insurance policy. (*Adams v. Explorer Ins. Co.* (2003) 107 Cal.App.4th 438, 451 [132 Cal.Rptr.2d 24] (*Adams*).) The central issue in this case is whether a document entitled "Evidence of Property Insurance" (EOI) issued by AMZ Insurance Services, Inc. (AMZ), was an enforceable binder of homeowners insurance extending coverage from appellant Pacific Specialty Insurance Company (PSIC) for a fire loss incurred by Cheryl Mustain.

After obtaining an assignment of rights, respondent Chicago Title Insurance Company (Chicago Title) brought this lawsuit asserting the EOI was an

enforceable binder and alleging PSIC and its owner, The McGraw Company doing business as McGraw Insurance Services (McGraw),[1] breached the terms of the EOI and engaged in bad faith by denying coverage for Cheryl Mustain's loss. The trial court determined the EOI was an insurance binder as a matter of law. The court so instructed the jury, subject to the jury's determinations whether AMZ had actual or ostensible authority to issue binders on behalf of PSIC and whether the EOI was lawfully cancelled before Cheryl Mustain's loss.

The jury found the EOI was not lawfully cancelled, AMZ had actual or ostensible authority to issue the EOI as an insurance binder, and PSIC acted in bad faith by failing to properly investigate the loss and pay proceeds under the policy. The court awarded Chicago Title a stipulated amount of recovery under the EOI and its attorney fees.

■ We affirm. The trial court did not err by instructing the jury the EOI was a binder of insurance and by denying PSIC and McGraw's motion for a judgment notwithstanding the verdict (JNOV), which asserted the EOI was not a binder as a matter of law. The EOI included all of the required elements for a binder under Insurance Code section 382.5, subdivision (a) and was issued by AMZ in accordance with procedures established by PSIC for binding coverage in escrow transactions. We also conclude substantial evidence supported the jury's findings of agency and bad faith, and the trial court did not err by denying PSIC and McGraw's motion based on the doctrine of superior equities or by denying PSIC and McGraw's motion for a judgment of indemnity against AMZ.

## FACTS

### I.

### *The Mustains Refinance Their Home Loan.*

In August or September 2005, Thomas Mustain and Cheryl Mustain (the Mustains) contacted a mortgage broker, Security Mortgage Lenders (Security), to refinance their home. Security obtained a loan for them from New Century Mortgage (New Century) and contacted Chicago Title to open an escrow for the transaction. Kara Mrozek was the escrow officer at Chicago Title who handled the Mustains' refinance escrow.

New Century conditioned the loan on the Mustains' obtaining a new policy of homeowners insurance. New Century would not fund the loan, and escrow

---

[1] PSIC and its owner, McGraw, are appellants. AMZ, though a defendant in the trial court, has not filed a brief on appeal.

could not close, without evidence the new insurance policy was in place and "[a]n acceptable policy, with endorsements," had been received in escrow. The initial premium would be paid through escrow, and it was the escrow officer's responsibility to make sure the premium was paid and evidence of insurance was presented to New Century.

Thu Vu, a loan processor at Security, contacted Jorge Torres, an insurance agent at AMZ, and requested homeowners insurance for the Mustains' home. AMZ is owned by Adel Zibara and had been writing homeowners insurance with PSIC since 1997. After speaking with Torres, Vu sent him by facsimile a written request for insurance stating, "Need Evidence Insurance" and "Rush Please," along with a copy of the Mustains' loan application.

Torres selected PSIC, which represented 10 to 20 percent of AMZ's business, because its binding procedures were easier than those of other insurance companies. To bind coverage, Torres prepared the EOI, which is a computer-generated form, naming PSIC as the insurer and the Mustains as the insureds under a policy of homeowners insurance. In escrow transactions for home mortgage refinance, using an EOI is the industry standard for providing proof of insurance.

## II.

### *PSIC Authorizes AMZ to Bind Coverage with EOI's.*

AMZ was not an appointed agent of PSIC. Their relationship was governed by a producer's agreement between AMZ and McGraw, stating: "Only upon specific written instruction from McGraw, by which McGraw binds coverage on a risk, may the Producer furnish a written binder of coverage to an insured" and "Producer has no authority to issue certificates of insurance, identification cards, endorsements, or other evidences of insurance with insurers represented by McGraw without the express written consent of McGraw."

The 1997 personal lines producer's agreement between McGraw and AMZ stated AMZ "has no authority to act on behalf of, or to bind, [PSIC] . . . other than the limited authority specifically provided on each application for insurance" and "[AMZ] shall always be deemed a representative of the insured and not an agent for the company unless an agency appointment has been made with the California Department of Insurance."

The application for the type of homeowners insurance policy at issue in this case included procedures requiring four conditions be met for AMZ to bind coverage: "1. All underwriting rules are followed. [¶] 2. Application is

fully completed and signed by applicant and producer. [¶] 3. Disclosure form is fully completed and signed by applicant. [¶] 4. Items 2–3 above are mailed to [the insurer]. If paid in full, 15 days. If installment payment plan requested, 5 days." The final condition required PSIC to receive payment of the premium before issuing the policy. The application containing the binding procedures is an internal document available online to AMZ representatives.

Despite the producer's agreement and the conditions set forth in the application, AMZ had authorization from PSIC to bind coverage of home-owners insurance for escrow transactions by issuing EOI's before receipt of the insurance premium payment and the signed application. Zibara testified that Jeff Jacob, PSIC's regional sales manager, had authorized him to issue EOI's as binders for escrow transactions. Before the EOI was issued in this case, AMZ had issued EOI's as binders on behalf of PSIC before receiving the premium payment on about 30 to 40 occasions. PSIC never objected to that practice.

Jacob had instructed AMZ representatives to use the producer code plus two random numbers as a temporary policy number on an EOI to use it as a binder. PSIC did not require AMZ to send it a copy of an EOI.

For escrow transactions, AMZ would obtain information from the escrow holder, issue and fax the EOI to the escrow, and send the application to the insured. Once AMZ received the signed application from the insured and the premium payment from escrow, AMZ would forward them to PSIC. If a signed application and premium payment were sent to PSIC within 15 days of the date of the EOI, then PSIC would issue a permanent policy effective retroactively to the date of issuance of the EOI.

If, after the EOI was issued, the premium was not paid or a signed application was not received by PSIC within 15 days, AMZ was authorized by PSIC to attempt to cancel the EOI by following certain procedures. Jacob instructed AMZ representatives to cancel an EOI by stamping the word "void" on the EOI issued in PSIC's name when the premium payment was not received within 15 days of the date the EOI was issued.

### III.

*AMZ Issues an EOI in Accordance with PSIC's Authorization and Instructions.*

The Mustains' unsigned loan application provided all the information AMZ needed to bind coverage with PSIC. Torres prepared an EOI, using the producer code for AMZ plus two randomly selected numbers for the policy

number. By using the EOI to bind coverage before receiving the premium payment and the signed application, and in assigning a policy number using AMZ's producer code, Torres was following instructions given by Jacob of PSIC for binding coverage in escrow transactions.

The EOI stated, "[t]his is evidence that insurance as identified below has been issued, is in force, and conveys all the rights and privileges afforded under the policy." The EOI identified the insurer as PSIC, the insureds as the Mustains, the property insured by address, the nature and limits of coverage, the amount of the deductible, the name of the AMZ representative, the amount of the annual premium, and the effective date of coverage.

Torres sent the EOI with a premium invoice to Vu within a few hours of her request for insurance. Based on the EOI, Vu believed homeowners insurance on the Mustains' home was in place. Although Torres testified he prepared an insurance application, dated it October 5, 2005, and mailed it to the Mustains with a note to sign and return the application as soon as possible, Cheryl Mustain testified the Mustains never received the insurance application or a premium invoice.

Vu sent a copy of the EOI to Mrozek at Chicago Title. Mrozek had seen EOI's issued by AMZ naming PSIC as the insurer five to 10 times and believed AMZ had authority to prepare and issue the EOI as an insurance binder. The EOI did not have a due date for payment of the premium, and nobody from AMZ informed Mrozek the premium had to be paid within 15 days of the October 5 issuance date of the EOI.

New Century funded the loan, and escrow closed on October 12, 2005. When escrow closed, Chicago Title had not sent a check for the premium payment to AMZ. Mrozek testified that nobody contacted her about the premium payment until after the fire loss on November 11, 2005.[2]

IV.

*AMZ Attempts to Cancel the EOI.*

When Torres noticed the premium had not been paid, he contacted Vu at Security and told her no insurance was in force because payment had not been received. Vu contacted an assistant of Mrozek at Chicago Title and

---

[2] Torres testified he contacted Mrozek between October 5 and November 11, 2005, and told her, "we haven't received payment on this file." According to Torres, Mrozek responded by saying she would look into the matter and get back to him. Torres testified he did not tell Mrozek the EOI was void or the policy was being cancelled. According to Torres, Mrozek told him she forgot to pay the premium.

asked why the premium had not been paid. The assistant told Vu the premium check was still in the file. Vu requested the premium check be sent to AMZ as soon as possible.

When, after 15 days from the issuance date of the EOI, payment had not been made and a completed application had not been received, AMZ stamped the word "void" on a copy of the EOI, as Jacob had instructed. On October 28, 2005, Zibara sent the EOI stamped "void" by facsimile to Security and to Chicago Title. A transmittal sheet of the facsimile sent to Security included a note stating, "[t]his fax letter is to inform that this policy # B20418-05 for THOMAS & CHERYL MUSTAIN is null and void from inception. As you know, we have not received the premium to remit to the insurance co." Zibara testified a copy of the EOI stamped "void" was mailed to New Century and to the Mustains. Torres never received a response from Chicago Title.

Mrozek testified she never received anything about voiding the policy and did not see the EOI stamped "void" or the facsimile sent to Security until trial. The Mustains never received a notice of cancellation of the policy and never received a copy of the EOI with "void" stamped on it. Vu also testified she never received an EOI stamped "void."

## V.

### *After the Mustains' House Burns Down, Cheryl Mustain Is Told She Has No Insurance.*

On November 11, 2005, the Mustains' house burned down. Thomas Mustain died in the blaze (a fact the trial court ruled inadmissible).

After the fire, Mrozek learned the premium check had not been sent to AMZ. The file for the Mustains' escrow revealed a premium check for the PSIC policy had never been cut. Mrozek testified that when she spoke with Torres after the fire, he mentioned the nonpayment of the premium but did not mention the EOI with the "void" stamp on it.

Cheryl Mustain timely contacted Vu at Security to report the loss to PSIC and make a claim. Vu gave her the telephone number for Torres and suggested she contact him. Cheryl Mustain contacted Torres, who told her he did not believe any insurance policy was in force but would investigate and call her back. Torres never called Cheryl Mustain and never responded to her phone calls.

Shortly after the fire, Zibara gave notice of the loss and claim to Jacob at PSIC. Zibara testified he provided Jacob with copies of all of the documents

from the Mustains' file, including the original EOI and the EOI stamped "void." Jacob told Zibara, "don't be concerned" because "[w]e've done everything by the book," which Zibara understood to mean AMZ had followed PSIC's procedures. Jacob said he would take over handling the matter.

Jacob discussed the matter with Brian Weaver, PSIC's vice-president of sales and marketing. Jacob did not give Weaver a copy of the EOI or other relevant documents but threw away the copies he received from Zibara. When Jacob explained that PSIC had not received a signed application or a premium payment, Weaver commented, "it probably would end up in court." Jacob determined the EOI issued to the Mustains' escrow was legally "inconsequential" and not worth forwarding to PSIC's claims department. At some point, Jacob told Zibara that PSIC was denying coverage on Cheryl Mustain's claim.

Cheryl Mustain retained an attorney who sought payment from Chicago Title. In settlement, Chicago Title paid Cheryl Mustain and New Century $270,200—the full amount of coverage stated in the EOI—and in exchange received an assignment of rights.

On February 23, 2006, Zibara faxed to counsel for Chicago Title documents from the Mustains' file at AMZ. The cover sheet included a note from Zibara, stating: "We followed the guidelines of [PSIC] in issuing the evidence of insurance which was faxed to SECURITY MORTAGE and CHICAGO TITLE." About a month later, in another facsimile cover sheet to Chicago Title's counsel, Zibara stated, "we followed the guidelines of Mcgraw/Pacific Specialty every step of the way." Zibara advised counsel to contact McGraw or PSIC "as they[']re the insurance carrier and binder was issued on their behalf by our office according to their procedures and guidelines."

## PROCEEDINGS IN THE TRIAL COURT

Based on the rights assigned from Cheryl Mustain, Chicago Title sued PSIC for breach of insurance contract, bad faith, and declaratory relief, and sued PSIC, AMZ, Security, and McGraw for negligence, equitable subrogation, equitable indemnity, and tort of another. AMZ filed a cross-complaint against PSIC and McGraw for indemnity, and PSIC and McGraw filed a cross-complaint against AMZ for declaratory relief, negligence, indemnity, and contribution.

Chicago Title moved for summary adjudication of whether PSIC and McGraw had a duty to indemnify Chicago Title for sums paid to Cheryl Mustain. PSIC and McGraw moved for summary judgment or summary

adjudication against Chicago Title on the ground no insurance contract existed between PSIC and the Mustains as a matter of law. PSIC and McGraw also sought summary judgment against AMZ on its cross-complaint. (AMZ did not oppose the motion, and the trial court granted PSIC and McGraw's summary judgment motion.)

The trial court denied Chicago Title's motion and PSIC and McGraw's motion against Chicago Title. In the minute order denying the motions, the court stated: "The Court rejects [PSIC and McGraw]'s contention that the [EOI] is not a binder. The Court finds that it is a binder under California Insurance Code Section 382.5 which temporarily obligates the insurer to provide insurance coverage pending issuance of the insurance policy. The Court specifically rejects the contention that the binder has no effect because of the failure to submit premiums or an application. Nothing on the [EOI] indicates that this is a condition precedent for the binder to be effective."

Just before trial, PSIC and McGraw filed a motion in limine to exclude reference to the EOI as a binder. At the hearing on the motion in limine, counsel for PSIC and McGraw argued the EOI was not a binder because it was not signed by an agent of PSIC and there was no mutual consent. PSIC and McGraw's counsel argued: "[A]s you mentioned in your ruling for motions for summary judgment, agency has not yet been established. So this is a potential binder; it is not binding on [PSIC] unless they have the opportunity to agree or disagree."

The trial court denied the motion in limine. In response to the court's invitation to "make a record," PSIC and McGraw's counsel stated: "Whether [the EOI] is a binder depends upon the facts in the case. It depends on a number of things, including whether or not AMZ was our actual or ostensible agent. That is the issue in the case. It doesn't become a binder on [PSIC] until there is a determination that AMZ was an agent."

At the outset of trial, before opening statements, the trial court preinstructed the jury on the applicable law and instructed the jury the EOI was a binder: "A document entitled 'Evidence of Property Insurance' naming [PSIC] was prepared and issued by AMZ Insurance, for the Mustains on 10-5-05. The court has already made a determination that: [¶] 1. The Evidence of Property Insurance was a legal binder or temporary policy; and [¶] 2. This binder or policy was not conditional upon payment of the policy premium or upon PSIC'S receipt of the signed application from the Mustains. [¶] You must determine whether or not: [¶] 1. The binder or temporary policy was legally cancelled before the Mustain's 11-11-05 loss; and [¶] 2. AMZ had actual or ostensible authority to issue the binder or temporary policy on behalf of PSIC."

PSIC and McGraw's counsel had objected to that instruction as contrary to the law and the facts of the case. PSIC and McGraw's counsel argued the EOI did not meet the requirements of a binder of insurance under Insurance Code section 382.5, AMZ was not PSIC's agent, AMZ had no notice of appointment as agent for PSIC on file with the Department of Insurance, PSIC had no agents, and PSIC required a signed application and payment of the premium before it would issue an insurance policy.

At the close of evidence, PSIC and McGraw moved for a nonsuit on two grounds: (1) PSIC had "superior equit[ies]" barring recovery by Chicago Title and (2) no contract of insurance existed between PSIC and the Mustains. The trial court denied the motion.

During jury instruction at the end of trial, the court reread the instruction stating the court had determined the EOI was a binder. The trial court refused to give PSIC and McGraw's requested jury instructions on agency and ostensible agency.

In a special verdict, the jury found (1) the EOI was not legally cancelled before the Mustains' fire loss on November 11, 2005; (2) AMZ had actual or ostensible authority to prepare and issue the EOI on behalf of PSIC and McGraw; (3) PSIC and McGraw breached their obligation of good faith and fair dealing by failing to pay insurance proceeds to the Mustains under the EOI; (4) PSIC and McGraw breached their obligation of good faith and fair dealing by failing to properly investigate the Mustains' fire loss; and (5) PSIC and McGraw's wrongful actions caused Chicago Title to bring the lawsuit against AMZ.

Chicago Title, PSIC, and McGraw had stipulated Chicago Title's damages for breach of contract would be $270,200 and the court would decide the amount of attorney fees damages if PSIC and McGraw were found liable for bad faith. Following the jury verdict, the trial court awarded Chicago Title $210,121.85 in attorney fees. A judgment awarding Chicago Title $480,321.85 was entered on September 10, 2008.

PSIC and McGraw moved for a judgment of indemnity against AMZ based on an indemnity provision in the producer's agreement. The trial court denied the motion on the ground indemnification would be inconsistent with the jury's finding of bad faith.

PSIC and McGraw moved for a JNOV and for a new trial. In the motion for a JNOV, PSIC and McGraw asserted the evidence at trial established the EOI was not a binder of insurance as a matter of law and failed to establish AMZ acted as PSIC's agent. PSIC and McGraw also filed a motion for

judgment based on the doctrine of superior equities, in which they asserted Chicago Title lacked standing to bring an equitable subrogation action. The trial court denied both motions.

PSIC and McGraw appealed from (1) the judgment, (2) the order granting Chicago Title's motion for attorney fees, (3) the order denying PSIC and McGraw's motion for judgment of indemnity against AMZ, (4) the order denying PSIC and McGraw's motion for judgment based on the doctrine of superior equities, (5) the order denying PSIC and McGraw's motion for a new trial, and (6) the order denying PSIC and McGraw's motion for a JNOV. The order denying PSIC and McGraw's motion for a new trial, No. (5), is not directly appealable but is reviewed on appeal from the judgment. (*Leaf v. City of San Mateo* (1984) 150 Cal.App.3d 1184, 1187, fn. 2 [198 Cal.Rptr. 447], disapproved on another ground in *Trope v. Katz* (1995) 11 Cal.4th 274 [45 Cal.Rptr.2d 241, 902 P.2d 259].) We treat Nos. (2), (3), and (4) as appeals from postjudgment orders appealable under Code of Civil Procedure section 904.1, subdivision (a)(2). The order denying PSIC and McGraw's motion for a JNOV, No. (6), is appealable under section 904.1, subdivision (a)(4).

## DISCUSSION

### I.

### *PSIC and McGraw Ignore Evidence Supporting the Judgment.*

Chicago Title argues PSIC and McGraw have waived any ground for reversal based on the substantial evidence rule because in the appellants' opening brief, PSIC and McGraw ignore evidence supporting the judgment.

An appellant asserting lack of substantial evidence must fairly state all the evidence, not just the evidence favorable to the appellant. (*Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832 [227 Cal.Rptr. 1].) "[A]n appellant who challenges a factual determination in the trial court—a jury verdict, or a finding by the judge in a nonjury trial—must marshal *all* of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557 [66 Cal.Rptr.3d 1]; see *McCauley v. Howard Jarvis Taxpayers Assn.* (1998) 68 Cal.App.4th 1255, 1266 [80 Cal.Rptr.2d 900] ["If one is going to make a 'the-facts-compel-that-I-win-as-a-matter-of-law' argument, one's brief must fairly state all the evidence."].)

If the appellant fails to fairly state all material evidence, we may deem waived any challenge based on insufficiency of the evidence. (*Foreman &*

*Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; see also *Oliver v. Board of Trustees, supra,* 181 Cal.App.3d at p. 832 ["Given this type of presentation the contention that the findings are not supported by substantial evidence may be deemed waived."]; *Hauselt v. County of Butte* (2009) 172 Cal.App.4th 550, 563 [91 Cal.Rptr.3d 343] ["plaintiff has forfeited [the substantial evidence] argument because he has cited only the evidence favorable to him"].)

Chicago Title is correct that in many instances PSIC and McGraw only cite evidence favorable to them. PSIC and McGraw ignore evidence establishing the following facts: Jacob had authorized AMZ to issue EOI's as binders in escrow transactions before receipt of the premium payments and the signed applications; AMZ had issued EOI's as binders on behalf of PSIC 30 to 40 times without complaint from PSIC; Zibara had told Jacob that AMZ had complied with PSIC's procedures; Jacob agreed that AMZ had complied with PSIC's procedures; Mrozek understood AMZ had authority to issue EOI's as binders; the Mustains never received the insurance application; the EOI recites the consideration for the policy; and Cheryl Mustain contacted AMZ after the fire loss to make a claim under the policy. PSIC and McGraw also ignore all of Chicago Title's expert witness testimony. Beyond these glaring omissions, PSIC and McGraw for the most part cite only evidence favorable to them.

In response, PSIC and McGraw argue the substantial evidence rule does not apply to several of their arguments and the testimony of Chicago Title's expert witness only repeated the substance of the jury instruction that the EOI was a binder. But PSIC and McGraw do not explain their failure to cite evidence favorable to the judgment when arguing insufficiency of the evidence as the basis for reversal.

Although we would be justified in concluding PSIC and McGraw have forfeited all arguments based on the substantial evidence rule, we will instead address each issue on the merits. In applying the substantial evidence rule, we accept as true the evidence supporting the judgment, disregard conflicting evidence, and draw all reasonable inferences in favor of the judgment. (*Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1285 [71 Cal.Rptr.3d 317].) As we will explain, substantial evidence supported the judgment.

## II.

### *The EOI Was an Enforceable Binder of Insurance.*

#### A. *Framing the Issue*

The primary issue at trial was, and on appeal is, whether the EOI constituted a binder providing insurance coverage by PSIC at the time of the Mustains' loss. The parties parse the issue in various ways. PSIC and McGraw devote much effort to arguing the trial court erred in deciding that issue as a "sub-issue" of Chicago Title's motion for summary adjudication, erred by denying PSIC and McGraw's motion in limine to exclude reference to the EOI as a binder, and erred in denying their motion for a JNOV. In response, Chicago Title argues PSIC and McGraw cannot challenge the trial court's "comments" in ruling on the motion for summary adjudication, and, in any event, the trial court determined only that the EOI was a " 'potential' binder," which, according to Chicago Title, PSIC and McGraw effectively admitted in their motion in limine.

The issue is not whether the trial court wrongly decided a subissue of Chicago Title's motion for summary adjudication or whether the trial court in denying summary adjudication concluded the EOI was a "potential binder." The court denied Chicago Title's summary adjudication motion and its comments and conclusions in reaching that decision did not produce any kind of dispositive ruling. As for the order denying PSIC and McGraw's motion in limine, "it is not even clear that [PSIC] is entitled to review of the in limine ruling" because " '[i]n limine rulings are not binding.' " (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 90, fn. 6 [89 Cal.Rptr.3d 34].) Contrary to Chicago Title's assertion, the trial court stated in the order denying summary adjudication the EOI was a binder; more importantly, the court so instructed the jury.

The jury instruction, not the ruling on the summary adjudication motion or motion in limine, was the point at which the trial court's determination the EOI was a binder became a cognizable appellate issue. At that point, the trial court's determination took concrete and final form and removed from the jury's consideration any factual issues on whether the EOI was a binder, other than the issues of agency and cancellation. The trial court's determination the EOI was a binder also became a cognizable appellate issue when the court denied PSIC and McGraw's motion for a JNOV, in which PSIC and McGraw asserted the EOI was not a binder as a matter of law under the evidence at trial. PSIC and McGraw can, and did, appeal from the order denying their motion for a JNOV. (Code Civ. Proc., § 904.1, subd. (a)(4).)

Thus, PSIC and McGraw's challenge to the EOI comes down to these two issues: (1) Did the trial court err by instructing the jury the court had determined as a matter of law the EOI was a binder? and (2) Did the trial court err by denying PSIC and McGraw's motion for a JNOV?

## B. Standards of Review

*Instructional Error.* "The propriety of jury instructions is a question of law that we review de novo." (*Cristler v. Express Messenger Systems, Inc., supra,* 171 Cal.App.4th at p. 82.)

*Denial of JNOV Motion.* " ' "A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is *no substantial evidence* to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." [Citation.]' " (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 878 [151 Cal.Rptr. 285, 587 P.2d 1098], italics added.) In reviewing an order denying a motion for a JNOV, we determine whether substantial evidence supported the verdict, viewing the evidence in the light most favorable to the party who obtained the verdict. (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 227 [26 Cal.Rptr.3d 798].) We resolve all conflicts in the evidence and draw all reasonable inferences in favor of the verdict, and do not weigh the evidence or judge the credibility of witnesses. (*Murray's Iron Works, Inc. v. Boyce, supra,* 158 Cal.App.4th at p. 1285.)

In reviewing the correctness of the jury instruction, we determine as a matter of law if resolution of factual issues was necessary to decide whether the EOI was a binder. In contrast, in reviewing the correctness of the order denying PSIC and McGraw's motion for a JNOV, we determine whether substantial evidence supported the verdict in favor of Chicago Title.

## C. Summary of Law Pertaining to Insurance Binders

A binder "temporarily obligates the insurer to provide . . . insurance coverage pending issuance of the insurance policy." (Ins. Code, § 382.5, subd. (a); see *Adams, supra,* 107 Cal.App.4th at p. 451 [a binder is a " 'temporary contract of insurance' "].)

Insurance Code section 382.5 provides in relevant part: "A binder which is issued in accordance with this section shall be deemed an insurance policy for the purpose of proving that the insured has the insurance coverage specified in the binder. [¶] (a) As used in this section, 'binder' means a

writing (1) which includes the name and address of the insured and any additional named insureds, mortgagees, or lienholders, a description of the property insured, if applicable, a description of the nature and amount of coverage and any special exclusions not contained in a standard policy, the identity of the insurer and the agent executing the binder, the effective date of coverage, the binder number or the policy number where applicable to a policy extension . . . ."

A binder remains in force for at least 30 days unless it is cancelled, rejected, or surrendered earlier. (Ins. Code, § 481.1, subd. (b).) If cancelled, rejected, or surrendered, the coverage terminates 10 days after written notice to the named insured is deposited in the mail. (*Id.*, § 481.1, subd. (a).)

A binder is an independent contract, separate and distinct from the permanent insurance policy. (*Adams, supra*, 107 Cal.App.4th at p. 451.) Formation of a binder is governed by the law of contracts. (*Apparel Mfrs. Supply Co. v. National Auto. & Cas. Ins. Co.* (1961) 189 Cal.App.2d 443, 453–454 [11 Cal.Rptr. 380].) "Whether or not a valid binder exists is a question of fact insofar as a finding comprehends issues relating to the credibility of witnesses or the weight of the evidence, but a question of law insofar as a finding embraces a conclusion that such factual elements do not constitute a valid oral binder." (*Spott Electrical Co. v. Industrial Indem. Co.* (1973) 30 Cal.App.3d 797, 805 [106 Cal.Rptr. 710].) "Whether undisputed facts establish the existence of a binder is a question of law." (*Adams, supra*, 107 Cal.App.4th at p. 451.)

█ A binder must include the following information: (1) the name and address of the insured and any additional named insureds, mortgagees, or lienholders, and a description of the property insured, if applicable; (2) a description of the nature and amount of coverage and any special exclusions not contained in a standard policy; (3) the identity of the insurer and the agent executing the binder; (4) the effective date of coverage; and (5) the binder number or the policy number (only if applicable to a policy extension). (2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, § 38, pp. 70–71; 2 Cal. Insurance Law & Practice (2010) § 9.06[1], pp. 9-25 to 9-26 (rel. 8-4/90).) A binder is deemed to include all of the usual terms of the policy as to which the binder was given, together with applicable endorsements. (Ins. Code, § 382.5, subd. (b).)

A binder is not necessarily a formal and comprehensive document but "is usually a memorandum evidencing the formation of a contract." (2 Cal. Insurance Law & Practice, *supra*, § 8.03[3][c], p. 8-24 (rel. 31-11/97).) " ' "The binder issued on an application for insurance is a mere memorandum of the most important terms of a preliminary contract of insurance, intended

to give temporary protection pending the investigation of the risk by the insurer or until the issuance of a formal policy." [Citations.]' " (*Ahern v. Dillenback* (1991) 1 Cal.App.4th 36, 48 [1 Cal.Rptr.2d 339].)

### D. *The Trial Court Correctly Instructed the Jury That the EOI Was a Binder of Insurance.*

#### 1. *On Its Face, the EOI Was a Binder of Insurance.*

The trial court instructed the jury that the court had determined the EOI was a binder not conditioned on the payment of a premium or PSIC's receipt of a signed application from the Mustains. The court instructed the jury it had to determine only (1) whether the binder was legally cancelled before the Mustains' loss, and (2) whether AMZ had actual or ostensible authority to issue the binder on PSIC's behalf.

The trial court correctly instructed the jury. The existence and content of the EOI were undisputed. "Whether undisputed facts establish the existence of a binder is a question of law." (*Adams, supra*, 107 Cal.App.4th at p. 451.)

The EOI on its face constituted a binder as a matter of law. It included all of the required elements for a binder under Insurance Code section 382.5, subdivision (a): The EOI identified the insurer (PSIC), the insureds (the Mustains), the (purported) agent executing the EOI (AMZ), the effective date of coverage, the binder number, and the address of the insured property. The EOI states, "[t]his is evidence that insurance as identified below has been issued, is in force, and conveys all the rights and privileges afforded under the policy." Under "Coverage," the EOI states, "See Supplemental Information Page(s)," which lists the coverages provided with the amounts of insurance and the deductible for each. The EOI recites the total annual premium as $776, and included with the EOI was an invoice to Chicago Title in that amount.

It was undisputed that Security, the Mustains' mortgage broker, asked AMZ to provide a homeowners policy on the Mustains' home and AMZ in response provided the EOI. It was undisputed that New Century, the lender, accepted the EOI as a binder and that escrow closed.

Only two factual issues affected the enforceability of the EOI as a binder—whether AMZ had actual or ostensible authority to bind PSIC, and whether PSIC legally cancelled the binder. The trial court correctly left those issues to the jury to decide.

### 2. *PSIC and McGraw's Asserted Factual Issues Relating to the EOI*

PSIC and McGraw argue they "raised several legitimate issues as to whether the EOI was a contract or a temporary policy of insurance," namely, (1) neither the EOI nor the application was signed by the Mustains, (2) the EOI did not contain mutual promises, (3) the EOI lacked mutual assent, (4) the EOI lacked consideration, and (5) the EOI did not impose any obligations on PSIC.

#### a. *Assent—Lack of a Signed Application*

■ PSIC and McGraw argue the EOI could not constitute a binding contract because the Mustains never returned a signed application. " '[W]hen it is a part of the understanding between the parties that the terms of their compact are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon, or it does not become a binding or completed contract.' " (*Kessinger v. Organic Fertilizers, Inc.* (1957) 151 Cal.App.2d 741, 749 [312 P.2d 345].)

PSIC's binding procedures state that "[r]isks will be bound" provided the applicant signs and returns the application. The personal lines producer's agreement between McGraw and AMZ required the named insured to sign all applications and stated AMZ had no authority to act on behalf of or to bind PSIC "other than the limited authority specifically provided on each application for insurance."

The Mustains did not return a signed application to AMZ because Cheryl Mustain testified she never received one. The binding procedures and the producer's agreement, however, are between McGraw and AMZ; the Mustains were not a party to either. Thus, the binding procedures and the producer's agreement do not set forth " 'the manner agreed upon' " (*Kessinger v. Organic Fertilizers, Inc., supra,* 151 Cal.App.2d at p. 749) between PSIC and *the Mustains* to assent to a binder or policy of insurance. Further, the evidence established that in escrow transactions, PSIC authorized AMZ to bind coverage by issuing an EOI before receiving a signed application.

#### b. *Mutuality of Obligation*

■ PSIC and McGraw argue the EOI was not enforceable as a binder because it did not contain mutual promises or obligations. "In order for a contract to be valid, the parties must exchange promises that represent legal obligations. [Citation.] An agreement is illusory and there is no valid contract

when one of the parties assumes no obligation. [Citation.]" (*Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 94–95 [119 Cal.Rptr.2d 62].)

■ PSIC and McGraw's argument misconstrues the nature and contents of a binder. A binder is, at root, a memorandum serving as evidence of the existence of an insurance contract and is " 'necessarily of the most informal character.' " (*Parlier Fruit Co. v. Fireman's etc. Ins. Co.* (1957) 151 Cal.App.2d 6, 20 [311 P.2d 62].) " 'It is a common practice pending delivery of a policy to issue to the person contracting for fire insurance some sort of a receipt or memorandum which is sometimes called a "binding slip," evidencing the making of the contract, and such memorandum is evidence of a present contract of insurance, affording temporary protection to the applicant pending the issuance of a policy, or consideration of the application and its acceptance or rejection.' [Citation.]" (*Ibid.*)

A binder need not recite the terms of the policy because it is deemed to include all of the usual terms of the policy as to which the binder was given. (Ins. Code, § 382.5, subd. (b); *Parlier Fruit Co. v. Fireman's etc. Ins. Co., supra,* 151 Cal.App.2d at p. 20 [a binder is " 'construed as being subject to the terms and conditions of the policy to be issued or of the policy ordinarily used by the company' "].)

The EOI obligated PSIC to provide coverage according to "the terms, conditions and exclusions customarily contained in the standard policy used by the issuer of the binder and in standard insurance policies used by insurance companies in general for the same or essentially similar coverage." (*National Emblem Ins. Co. v. Rios* (1969) 275 Cal.App.2d 70, 76 [79 Cal.Rptr. 583].) In exchange, the EOI evidences an obligation on the insured to pay the premium, recited in the EOI as $776 annually.

### c. *Mutual Assent*

■ Mutual assent is necessary for contract formation. (Civ. Code, §§ 1550, 1565.) "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 [127 Cal.Rptr.2d 145].) Mutual assent is a question of fact. (*Ibid.*)

PSIC and McGraw argue PSIC never assented to the EOI as a binder because it never received the EOI, the Mustains' application, or the premium payment, and had no knowledge of the transaction. However, AMZ's actions in issuing the EOI constituted assent. Whether the EOI lacked mutual assent

therefore depends on whether AMZ was acting as PSIC's actual or ostensible agent, an issue that was presented to the jury to decide.

### d. *Consideration*

■ Every executory contract requires consideration, which may be an act, forbearance, change in legal relations, or a promise. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 202, p. 236.) " '[F]or the contract to bind either party, both must have assumed some legal obligations.' " (*Bleecher v. Conte* (1981) 29 Cal.3d 345, 350 [213 Cal.Rptr. 852, 698 P.2d 1154].)

PSIC and McGraw argue the EOI lacked consideration because it imposed no legal obligation on the Mustains or Chicago Title to pay the premium. A binder need not identify any consideration because an agreement to pay the insurer's usual premium will be implied. (*Apparel Mfrs. Supply Co. v. National Auto. & Cas. Ins. Co., supra*, 189 Cal.App.2d at p. 456.) Nonetheless, the EOI gives the total annual premium as $776, and included an invoice from AMZ to Chicago Title, stating the premium of $776 was "Due and Payable upon Receipt." No evidence was presented to suggest Chicago Title did not believe it was legally obligated to pay the premium.

### e. *Whether the EOI Obligated PSIC*

Citing Insurance Code section 382.5, subdivision (a), PSIC and McGraw argue the EOI could not be a binder because it did not contain language obligating them to provide any insurance coverage pending issuance of the policy. PSIC and McGraw again misconstrue the nature and contents of a binder.

■ The first sentence of subdivision (a) of Insurance Code section 382.5 divides the definition of binder into two parts. The first part of the definition, following the number (1), is prescriptive, and lists the prescribed contents of a binder such as the name and address of the insured. The second part of the definition, following the number (2), is descriptive, not prescriptive, and describes the legal effect of the binder as "temporarily obligat[ing] the insurer to provide that insurance coverage pending issuance of the insurance policy." Thus, the binder need only identify the nature and amount of coverage and any special exclusions not contained in a standard policy. The EOI satisfied that requirement. The EOI obligated PSIC to provide insurance according to "the terms, conditions and exclusions customarily contained in the standard policy" used by PSIC. (*National Emblem Ins. Co. v. Rios, supra*, 275 Cal.App.2d at p. 76.)

### 3. PSIC and McGraw's Failure to Offer Jury Instructions on Contract Formation

PSIC and McGraw argue the trial court erred by refusing to give PSIC and McGraw's proposed jury instructions on contract formation, CACI Nos. 300, 302 to 307, and 309. PSIC and McGraw provide no record citations to support their assertion they offered contract formation instructions. By failing to cite to the record, PSIC and McGraw have waived the argument. (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799–800 [99 Cal.Rptr.3d 464]; see Cal. Rules of Court, rule 8.204(a)(1)(C).) "When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made." (*In re S.C.* (2006) 138 Cal.App.4th 396, 406 [41 Cal.Rptr.3d 453].) Despite this lack of record citations, we have reviewed those instructions in the appellants' appendix marked refused or withdrawn, and instructions on contract formation are not among them.

PSIC and McGraw's failure to offer proposed jury instructions on contract formation means any error in instructing the jury the EOI was a binder was harmless. Instructional error in a civil case is prejudicial " 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Because the record shows PSIC and McGraw failed to offer proposed instructions on contract formation, the jury could not have decided the purported factual issues that PSIC and McGraw contend were necessary to determine whether the EOI was a binder.

### E. The Trial Court Did Not Err by Denying PSIC and McGraw's Motion for a JNOV.

PSIC and McGraw argue the trial court erred in denying their motion for a JNOV because the evidence introduced at trial established the EOI was not a binder as a matter of law under basic contract principles. We disagree. As we have explained, there were no factual issues on contract formation for the jury to decide other than agency, and, on the evidence presented at trial, the EOI was a binder as a matter of law.

In addition, Chicago Title's expert witness Clinton Miller testified the EOI constituted a binder. When asked why the EOI was a binder, Miller answered: "Industry standards. That's what the insurance industry uses to bind coverage." Miller testified that, in his experience, the EOI form is routinely used as a binder.

Substantial evidence supported the verdict; therefore, the trial court did not err by denying PSIC and McGraw's motion for a JNOV. (*Clemmer v. Hartford Insurance Co., supra,* 22 Cal.3d at pp. 877–878.)

III.

*The Evidence at Trial Supported the Jury's Finding That
AMZ Was PSIC's Agent.*

The jury specifically found that AMZ was PSIC's actual or ostensible agent. PSIC and McGraw contend AMZ was not PSIC's actual agent for two reasons: (1) AMZ did not have an appointment on file with the Department of Insurance to act as PSIC's agent, and (2) the producer's agreement between McGraw and AMZ creates a broker relationship and expressly denies AMZ authority to bind PSIC without written authorization.[3] We conclude substantial evidence supported the jury's finding of agency.

 "Any person acting as a licensee under this chapter shall not act as an agent of an insurer unless the insurer has filed with the commissioner a notice of appointment, executed by the insurer, appointing the licensee as the insurer's agent." (Ins. Code, § 1704, subd. (a).) " 'In addition to possessing a license, an insurance agent must be authorized by an insurance carrier to transact insurance business on the carrier's behalf. This authorization must be evidenced by a notice of agency appointment on file with the Department of Insurance. [Citation.]' " (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 929 [20 Cal.Rptr.3d 485].)

It is undisputed that AMZ did not have a notice of appointment from PSIC on file with the Department of Insurance. While the lack of a notice of appointment might subject AMZ to fines or a disciplinary proceeding, AMZ's actions in issuing the EOI as a binder could bind PSIC if the facts otherwise support an agency relationship. "[Insurance Code section 1704, subdivision (a)] may simply impose further requirements on the conduct of an insurance agent, rather than establishing additional criteria for the creation of an agency relationship. In other words, it may be unlawful for an entity to act as an agent of the insurer without complying with section 1704[, subdivision ](a), but that entity would still constitute an insurance agent for the

---

[3] An insurance broker is "a person who, for compensation and on behalf of another person, transacts insurance other than life insurance with, but not on behalf of, an admitted insurer." (Ins. Code, § 1623, subd. (a).) A broker is not an agent of and cannot bind the insurer, and the insurer is not liable for the broker's acts or omissions. (*Rios v. Scottsdale Ins. Co.* (2004) 119 Cal.App.4th 1020, 1026 [15 Cal.Rptr.3d 18]; *Kurtz, Richards, Wilson & Co. v. Insurance Communicators Marketing Corp.* (1993) 12 Cal.App.4th 1249, 1257–1258 [16 Cal.Rptr.2d 259].)

present purposes." (*Oakland-Alameda County Coliseum, Inc. v. National Union Fire Ins. Co.* (N.D.Cal. 2007) 480 F.Supp.2d 1182, 1196.) We agree with this reasoning.

■ The evidence established AMZ had actual authority to bind PSIC by issuing EOI's for escrow transactions. Actual authority can arise as a result of the principal's conduct that causes the agent reasonably to believe that the principal consents to the agent's act on the principal's behalf. (*Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 643 [39 Cal.Rptr. 731, 394 P.2d 571]; see Civ. Code, § 2316 ["Actual authority is such as a principal . . . intentionally, or by want of ordinary care, allows the agent to believe himself to possess."].) Testimony at trial established that Jacob had instructed and authorized Zibara and Torres at AMZ to bind PSIC in escrow transactions by issuing EOI's before receipt of the premium payment and a signed application. Zibara and Torres understood they could issue binders on behalf of PSIC by following those procedures. AMZ had bound PSIC in this fashion 30 to 40 times without complaint from PSIC or instructions to cease.

■ PSIC and McGraw argue AMZ acted outside the scope of authority to act as PSIC's agent by issuing an EOI as a binder in violation of written guidelines for binding homeowners policies. This argument ignores the evidence that Jacob had instructed and authorized AMZ to issue EOI's as binders for escrow transactions before receiving premium payments and signed applications. In addition, "the general rule is that '. . . in the absence of notice, actual or constructive, to the insured of any limitations upon such agent's authority, a general agent may bind the company by any acts, agreements or representations that are within the ordinary scope and limits of the insurance business entrusted to him, although they are in violation of private instructions or restrictions upon his authority.' " (*Troost v. Estate of DeBoer* (1984) 155 Cal.App.3d 289, 298 [202 Cal.Rptr. 47], quoting *Cronin v. Coyle* (1935) 6 Cal.App.2d 205, 213 [44 P.2d 385].) Neither the Mustains nor Chicago Title was informed that AMZ's authority to issue EOI's as binders of homeowners insurance was limited in any way.

■ The evidence also supported a finding of ostensible authority. "[O]stensible authority arises as a result of conduct of the principal which causes *the third party* reasonably to believe that the agent possesses the authority to act on the principal's behalf." (*Tomerlin v. Canadian Indemnity Co., supra,* 61 Cal.2d at p. 643; see Civ. Code, § 2300.) "Ostensible authority may be established by proof that the principal approved prior similar acts of the agent." (*United States Credit Bureau, Inc. v. Cheney* (1965) 235 Cal.App.2d 357, 360 [45 Cal.Rptr. 525].) " '[W]here the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability. [Citation.]'

[Citation.]" (*Gulf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 439 [103 Cal.Rptr.2d 305], quoting *Preis v. American Indemnity Co.* (1990) 220 Cal.App.3d 752, 761 [269 Cal.Rptr. 617].)

By issuing the EOI as a binder before payment of the premium and receipt of the signed application, AMZ was acting according to PSIC's instructions and with PSIC's authorization. Zibara testified AMZ had issued EOI's as binders in such circumstances 30 to 40 times without objection from PSIC. Mrozek testified she had seen EOI's issued by AMZ naming PSIC as the insurer five to 10 times and believed AMZ had authority to prepare and issue the EOI for the Mustains.

Citing Civil Code section 2334, PSIC and McGraw argue they cannot be held liable based on ostensible authority because the Mustains and Chicago Title were negligent. Civil Code section 2334 states: "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." PSIC and McGraw's argument the Mustains were negligent for failing to return a signed insurance application ignores Cheryl Mustain's testimony that she never received an application. PSIC and McGraw assert Chicago Title was negligent for failing to pay the premium; however, Chicago Title's negligence is not material because, as the jury found, the EOI was not lawfully cancelled.

## IV.

### *The Jury's Finding That the EOI Was Not Legally Cancelled Is Binding on PSIC.*

The jury found PSIC and McGraw did not legally cancel the EOI before Cheryl Mustain's fire loss. PSIC and McGraw did not challenge that finding in their opening brief or in their motion for a JNOV. For that reason, Chicago Title asserts in the respondent's brief that PSIC and McGraw forfeited any challenge to the jury's finding the EOI was not legally cancelled. For the first time, *in the reply brief*, PSIC and McGraw argue the evidence does not support that finding. We deem the argument waived and conclude PSIC and McGraw are bound by the jury's finding the EOI was not lawfully cancelled. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 349–350 [86 Cal.Rptr.3d 383]; *Cold Creek Compost, Inc. v. State Farm Fire & Casualty Co.* (2007) 156 Cal.App.4th 1469, 1486 [68 Cal.Rptr.3d 216] ["Arguments cannot properly be raised for the first time in an appellant's reply brief, and accordingly we deem them waived in this instance."]; *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 351 [100

Cal.Rptr.2d 854] [argument raised for the first time in the litigation in appellant's reply brief is "doubly waived"].)

V.

### The Evidence at Trial Supported the Jury's Finding of Bad Faith.

PSIC and McGraw argue (1) the evidence did not support the jury's finding they acted in bad faith by failing to properly investigate Cheryl Mustain's claim and (2) the trial court erred in denying PSIC and McGraw's motion for a JNOV based on insufficiency of the evidence to support that finding. In making those arguments, PSIC and McGraw ignore evidence supporting a finding of bad faith and recite only evidence in their favor. Most strikingly, PSIC and McGraw assert Cheryl Mustain "never demanded coverage" and "[t]he only evidence presented at trial was that PSIC did not provide coverage."

 " '[T]he ultimate test of [bad faith] liability in the first party cases is whether the refusal to pay policy benefits was unreasonable.' " (*Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 973 [135 Cal.Rptr.2d 718].) An insurer cannot reasonably and in good faith deny insurance benefits to its insured without fully investigating the grounds for its denial. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818–819 [169 Cal.Rptr. 691, 620 P.2d 141].)

An insurer is not liable in bad faith for denying or delaying payment of policy benefits based on a genuine dispute with the insured as to the existence or amount of coverage. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723 [68 Cal.Rptr.3d 746, 171 P.3d 1082].) "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." (*Ibid.*)

The evidence fully supported the jury's finding of bad faith. After the fire, Cheryl Mustain timely contacted Vu at Security to report the loss to PSIC and make a claim. Vu gave her the telephone number for Torres and suggested she contact him. Cheryl Mustain contacted Torres, who told her he did not believe any insurance policy was in force but he would investigate and call her back. Torres did not call Cheryl Mustain back. Shortly thereafter, Zibara gave notice of the loss and claim to Jacob at PSIC. Zibara testified he provided Jacob with copies of all of the documents from the Mustains' file, including the original EOI and the EOI stamped "void." Jacob told Zibara,

"don't be concerned" because "[w]e've done everything by the book." Jacob said he would take over handling the matter.

Jacob then discussed the matter with Weaver, PSIC's vice-president of sales and marketing. Jacob did not give Weaver a copy of the EOI or other relevant documents but threw away the copies he received from Zibara. When Jacob explained that PSIC had not received a signed application or a premium payment, Weaver commented, "it probably would end up in court." Jacob determined the EOI issued to the Mustains' escrow was legally "inconsequential" and not even worth forwarding to PSIC's claims department.

There was no question Cheryl Mustain's loss came within the coverage identified in the EOI. The evidence established AMZ issued the EOI as a binder in accordance with instructions from PSIC for binding insurance in escrow transactions. AMZ followed PSIC's procedures to the letter; as Zibara stated, "[w]e followed the guidelines of [PSIC] in issuing the evidence of insurance . . . ." PSIC did not investigate whether its policy of authorizing AMZ to cancel a binder by stamping "void" on the EOI was lawful.

The evidence supported the inference too that PSIC's policies and practices for issuing EOI's were created in bad faith to allow PSIC to try to evade liability precisely in the circumstances presented by this case. To capitalize on the need for immediate issuance of binders for escrow transactions, PSIC authorized and instructed AMZ to issue EOI's as insurance binders before receiving the premium payment and a signed application. If a problem later arose, PSIC would claim, as it did here, that AMZ was not its agent, the EOI is not a binder, and PSIC's written guidelines and policies for issuing binders were not followed.

Because substantial evidence supported the jury's finding of bad faith, the trial court did not err in awarding Chicago Title attorney fees. (See *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 [210 Cal.Rptr. 211, 693 P.2d 796].) PSIC and McGraw do not challenge the amount of attorney fees awarded.

VI. *Chicago Title Had Superior Equities to PSIC and Did Not Act as a Volunteer.*

A. *Chicago Title Had Superior Equities.*

PSIC and McGraw argue the trial court erred in denying their posttrial motion for judgment based on the doctrine of superior equities. PSIC and McGraw argue that under the doctrine of superior equities, Chicago Title had no right to sue because its equities were inferior to those of PSIC and McGraw.

In making that argument, PSIC and McGraw again do not fairly state the evidence and do not cite the evidence supporting the trial court's ruling. PSIC and McGraw go so far as to characterize themselves as "innocent insurers" that did not give AMZ authority to bind coverage, and, ignoring the jury's finding the binder was not lawfully cancelled, blame Chicago Title for failing to pay the premium.

In denying PSIC and McGraw's motion based on the doctrine of superior equities, the trial court found: "[T]he equities weigh heavily in favo[]r of [Chicago Title] despite [its] error in not sending the premium for the insurance earlier. PS[IC] allowed its producer, AMZ Insurance Inc. to issue binders of insurance in violation of their producer agreement and failed to recognize coverage when obligated to do so. In view of these findings, it is inconceivable to find that the equities favo[]r . . . PS[IC]. This factual pattern does not approach the cases in which the court of appeal found equities barred equitable subrogation."

██ The doctrine of superior equities prevents a subrogated party from recovering against a party having equal or superior equities. (*State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098, 1107 [49 Cal.Rptr.3d 785].) "Under the doctrine of superior equities, although an insurer might have a subrogation interest in the insured's claim against the party that caused the loss, it cannot enforce its subrogation rights unless it has equities superior to those of the wrongdoer." (*Id.* at p. 1108.)

Chicago Title argues the doctrine of superior equities only applies to subrogated insurers; as Chicago Title is not an insurer, but received a contractual assignment of Cheryl Mustain's claims, it argues the doctrine is inapplicable here. We do not resolve that issue because the evidence supported the trial court's finding Chicago Title had superior equities.

"In comparing the relative positions of the parties, a court is required to determine who ultimately ought to bear the loss." (*State Farm General Ins. Co. v. Wells Fargo Bank, N.A., supra,* 143 Cal.App.4th at p. 1112.) "[T]here is no facile formula for determining superiority of equities, for there is no formula by which to determine the existence or nonexistence of an equity except to the extent that certain familiar fact combinations have been repeatedly adjudged to create an equity in the surety or the third party. The cases in other jurisdictions refer to various factors which spell fault in the . . . third party, but whatever the criteria mentioned each case comes down to the question of fault of some kind . . . ." (*Hartford Acc. & Indem. Co. v. Bank of America* (1963) 220 Cal.App.2d 545, 558 [34 Cal.Rptr. 23].) "A more balanced statement is that the right of subrogation 'may be invoked against a third party only if he is guilty of some wrongful conduct which makes his

equity inferior to that of [the surety or insurer].' [Citations.]" (*Golden Eagle Ins. Co. v. First Nationwide Financial Corp.* (1994) 26 Cal.App.4th 160, 171 [31 Cal.Rptr.2d 815].)

Chicago Title at worst acted negligently by failing to pay the premium on the policy evidenced by the EOI. Its negligence was not the direct cause of the loss; as the jury found, the EOI was not lawfully cancelled after AMZ failed to receive the premium payment. PSIC, in contrast, engaged in bad faith. It authorized AMZ to issue EOI's as binders before receipt of the premium payment and signed application, instructed AMZ to cancel binders in an improper manner, and declined to submit Cheryl Mustain's claim to its claims department. The trial court correctly concluded Chicago Title's equities were superior to PSIC's.

PSIC and McGraw contend *Lawyers Title Ins. Corp. v. Feldsher* (1996) 42 Cal.App.4th 41 [49 Cal.Rptr.2d 542] (*Feldsher*) is a similar case. In *Feldsher*, Greenberg loaned $300,000 to Razzano. The loan was secured by real property in La Cañada. (*Id.* at p. 44.) Greenberg's loan was used to retire a loan secured by a second trust deed on the same property and was to become senior to a fourth deed of trust in favor of the Feldshers. Greenberg obtained a title policy from Lawyers Title Insurance Corporation, which allowed escrow to close without following an instruction to record Greenberg's trust deed senior to the Feldshers' trust deed. Razzano defaulted on the Feldshers' trust deed, prompting the Feldshers to foreclose and purchase the property at the trustee's sale, wiping out the Greenberg trust deed. (*Ibid.*) Lawyers Title ultimately indemnified Greenberg, received an assignment of his claim against the Feldshers, and filed a complaint against the Feldshers under a theory of equitable subrogation. (*Id.* at pp. 44–45.)

The trial court granted summary judgment in favor of the Feldshers on the ground they had superior equities. (*Feldsher, supra,* 42 Cal.App.4th at p. 45.) The Court of Appeal affirmed, based on Greenberg's culpable conduct: "While the equities in this case appear more or less evenly balanced, the undisputed fact remains Greenberg had actual knowledge of all the facts necessary to protect his interests and, unlike the Feldshers who were unaware of Greenberg's contemplated loan, was in a position to avoid any harm. Nevertheless, despite this knowledge Greenberg failed to take any affirmative steps to protect those interests. Greenberg's actual knowledge of the crucial facts, combined with his negligence in allowing the transaction to close despite the absence of a subordination agreement, is the type of 'culpable and inexcusable neglect' which justifies denial of equitable subrogation under the overall circumstances of this case." (*Id.* at pp. 53–54.)

This case is different from *Feldsher* in several important respects. Here, the equities are far from evenly balanced. PSIC, unlike the Feldshers, was in a

position to avoid harm and engaged in bad faith conduct. Cheryl Mustain, unlike Greenberg, did not have actual knowledge of any failure to pay the premium and testified she never received the insurance application.

### B. *Chicago Title Did Not Act as a Volunteer.*

PSIC and McGraw also contend that if Chicago Title breached no duties, then it acted as a volunteer by paying Cheryl Mustain and cannot maintain an action for subrogation.

 Subrogation arises when one party (the subrogee) indemnifies or pays the principal debtor's obligation to the creditor or claimant (the subrogor). (*Morgan Creek Residential v. Kemp* (2007) 153 Cal.App.4th 675, 690 [63 Cal.Rptr.3d 232].) The subrogee succeeds to the claimant's position or rights against the principal debtor or obligor. (*Ibid.*) " 'By undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the "subrogee" is equitably subrogated to the claimant (or "subrogor"), and succeeds to the subrogor's rights against the obligor.' " (*Ibid.*) A party claiming to be equitably subrogated to the rights of a creditor must meet these requirements: (1) the subrogee made payment to protect the subrogee's own interest; (2) the subrogee must not have acted as a volunteer; (3) the debt paid must be one for which the subrogee was not primarily liable; (4) the entire debt must have been paid; and (5) subrogation must not cause injustice to the rights of others. (*Caito v. United California Bank* (1978) 20 Cal.3d 694, 704 [144 Cal.Rptr. 751, 576 P.2d 466].)

PSIC and McGraw argue the second requirement has not been met. According to them, Chicago Title acted as a volunteer because it did not need to pay Cheryl Mustain to protect its own interest if, as Chicago Title contends, the EOI was an enforceable binder of insurance.

Chicago Title did not act as a volunteer. Chicago Title failed to pay the premium on the policy before the fire loss and therefore faced potential liability at the time it paid Cheryl Mustain and accepted an assignment of her rights. Chicago Title's potential liability was a protectable interest sufficient to create subrogation rights.

In *Employers etc. Ins. Co. v. Pac. Indem. Co.* (1959) 167 Cal.App.2d 369 [334 P.2d 658], a question arose whether the insured's loss was covered by a comprehensive liability policy or an automobile insurance policy. The comprehensive liability insurer paid the insured and brought an equitable subrogation action against the automobile insurer. (*Id.* at pp. 373–374.) The trial court determined the loss was covered under the automobile policy. An issue on appeal was whether the comprehensive liability insurer was a volunteer

because it had no legal obligation under the comprehensive liability policy. (*Id.* at p. 376.) The Court of Appeal concluded the comprehensive liability insurer was not a volunteer: "Even though there was no legal obligation on plaintiff to make the payment it nevertheless had an interest to protect in making it. That interest arose from the fact that there was a dispute between it and defendant as to which policy, plaintiff's or defendant's, covered the accident. That this was such a dispute as justified plaintiff in settling for a less sum than it might have been liable for if its contention that its policy did not cover the accident were incorrect, is shown by defendant's insistence here that the policy did cover the accident." (*Id.* at p. 377.)

Similarly here, at the time Chicago Title paid Cheryl Mustain, there was a dispute whether PSIC or Chicago Title was responsible for covering her loss. Cheryl Mustain had retained an attorney and sought compensation from both PSIC and Chicago Title. PSIC and McGraw asserted, and continue to assert, they have no liability under the EOI. That dispute, Cheryl Mustain's claim, and Chicago Title's potential liability created the necessary interest for Chicago Title to protect. By paying Cheryl Mustain, Chicago Title acted not as a volunteer, but to protect that interest.

## VII.

### *PSIC and McGraw Were Not Entitled to Judgment Against AMZ for Indemnity.*

PSIC and McGraw argue the trial court erred by denying their posttrial motion for judgment of indemnity against AMZ. PSIC and McGraw assert the "unequivocal language" in an indemnification provision in the producer's agreement between McGraw and AMZ entitled PSIC to judgment against AMZ.

In denying PSIC and McGraw's motion for judgment of indemnity against AMZ, the trial court stated: "Despite the jury's determination that the producer's agreement which on its face did not allow AMZ to send out insurance binders was not dispositive of the issue in light of PSIC/McGraw's conduct in knowingly allowing such practices to continue by its producer, PSIC/McGraw continues to assert that this provision now entitles it to indemnification from AMZ. The court cannot and refuses to make a factual determination that is inconsistent with the jury's determination, a determination which the court now adopts, despite the fact that AMZ is in default. The finding of bad faith conduct clearly bars PSIC/McGraw from indemnification of these intentional tort damages. [Code of Civil Procedure,] section 875[, subdivision ](d). Its bad faith conduct in refusing to acknowledge coverage

most likely bars it from indemnification for the remaining damages. Moreover, no authority has been provided to the contrary in light of PSIC/McGraw's continual failure to acknowledge the effect of the jury's finding and to propose a factual scenario which entitles it to indemnification that is consistent with the jury's findings."

The relevant portion of the indemnity provision in the producer's agreement states: "In the event of an *unauthorized binder* or other *unauthorized statement of coverage* by Producer, Producer shall and will at all times indemnify and keep indemnified McGraw and Insurance company from and against any and all liability, claims, demands, losses, damages, costs, counsel fees, judgments and expense of whatever kind or nature." (Italics added.)

PSIC and McGraw are not entitled to indemnity under that provision because AMZ did not issue an unauthorized binder or statement of insurance. PSIC authorized AMZ to issue EOI's as binders in escrow transactions before receipt of the premium payment and a signed application, and authorized AMZ to attempt to cancel binders in an unlawful manner.

▌ In addition, as the trial court found, the indemnity provision does not permit PSIC to recover for its intentional and bad faith conduct. "An indemnity agreement which is broadly worded and refers only generally to indemnification for claims or losses, is interpreted as providing indemnity, at most, for the indemnitee's passive negligence; to obtain greater indemnity, more specific language must be used." (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1737 [286 Cal.Rptr. 435]; see *Gonzales v. R. J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 809–810 [144 Cal.Rptr. 408, 575 P.2d 1190] [a general indemnity clause "will not be interpreted to provide indemnity if an indemnitee has been *actively* negligent"].)

In *Edmondson Property Management v. Kwock* (2007) 156 Cal.App.4th 197, 207 [67 Cal.Rptr.3d 243], the parties had entered into an indemnification agreement stating: " 'Owner shall indemnify and save the Agent harmless from any and all costs, expenses, attorney's fees, suits, liabilities, damages from or connected with the management of the property by Agent, or the performance or exercise of any of the duties, obligations, powers, or authorities herein or hereafter granted to Agent. [¶] Owner shall not hold Agent liable for any error of [judgment], or for any mistake of fact or law, or for anything which Agent may do or refrain from doing hereinafter, except in cases of willful misconduct or gross negligence.' " The court held this was a general indemnity provision and therefore did not indemnify against claims arising out of the agent's active negligence. (*Id.* at p. 208.) "Language

imposing this liability must be express and unequivocal so that the contracting party is advised fully in definite terms that it has agreed to indemnify the active negligence of the other party." (*Ibid.*)

The indemnification provision in the producer's agreement is a general indemnity, similar to that in *Edmondson Property Management v. Kwock*, because it " 'does not address itself to the issue of an indemnitee's negligence' " (*Gonzales v. R. J. Novick Constr. Co., supra,* 20 Cal.3d at p. 809). The indemnification provision in the producer's agreement does not expressly and unequivocally impose liability for anything other than PSIC's passive negligence. The evidence established PSIC and McGraw at the very least engaged in intentional conduct; the jury found they engaged in bad faith. The trial court correctly denied PSIC and McGraw's motion for a judgment of indemnity against AMZ.

### DISPOSITION

The judgment, the order granting Chicago Title's motion for attorney fees, the order denying PSIC and McGraw's motion for a JNOV, the order denying PSIC and McGraw's motion for judgment of indemnity against AMZ, and the order denying PSIC and McGraw's motion based on the doctrine of superior equities are affirmed. Respondent Chicago Title to recover costs incurred on appeal.

Moore, Acting P. J., and Aronson, J., concurred.

The petition of respondent AMZ Insurance Services, Inc., for review by the Supreme Court was denied December 15, 2010, S187413.